May it please the court, my name is Mei Chen. I represent the petitioner Jamal Abdo Ahmad Al-Jabre. These are consolidated cases involving asylum withholding and CAT. And this is related to inter-tribal dispute in Yemen. And the other cases are consolidated with two motions to reopen and a motion for reconsideration. First, I will address Petitioner's asylum case on appeal. The question at issue here is whether substantial evidence supports the Board's decision to uphold the immigration judge's clearly erroneous adverse credibility findings. This case is governed by the Real ID Act because Petitioner filed his asylum application after May 11, 2005. But let me ask you about one of the bases for the adverse credibility determination. That was the one about whether the passport was given to the smuggler or whether the passport was lost. And that seems to be something that your client acknowledged was an inconsistency. But the argument was, well, it's an inconsistency that doesn't go to the heart of the asylum claim. But we no longer have that standard under Real ID Act. So is that enough to support the IJ's adverse credibility determination? No, Your Honor. No, Your Honor. The IJ erred in finding that Petitioner made inconsistencies regarding his passport in this case because there was the police report that was the only evidence that the I would like to refer the Court to at Administrative Record page 270, and I'm looking at the Administrative Record for case number 11, 71534. It says here that Respondent Al-Jabbar claimed that he did not have the money to pay the smuggler and that this person kept his passport until it was paid off. This document in and of itself does not establish the – does not clarify whether or not Respondent had actually paid off the smuggling fee. Yeah, but then he testified in court that he lost his passport, and the police report said he lost his passport. So it seems quite inconsistent to say, I didn't get that I was unable to pay the money to the smuggler, so they took my passport, versus I, quote, lost my passport. Those are two pretty different stories. Why wasn't the ALJ within bounds to determine that that was a significant conflict? Your Honor, I believe that the Petitioner was never afforded an opportunity to explain how he lost the passport. The only indication he gave two stories. He doesn't – you don't deny that he gave two stories, do you? I do not believe that Petitioner is asserting that he – there was two stories, Your Honor. You mean the record is wrong? The only – There were two stories about the passport. Your Honor, I believe that's so, but we do not know whether or not he had recovered the passport from the smuggler and then he had lost the passport the second time. He had his job on station. And that fact wasn't clear. Testified at the hearing, correct? He didn't – I don't believe that he was asked that question regarding whether or not he had – how he lost the passport. Well, but he had an opportunity. You're not suggesting that his questioning was cut off in some way, are you? Your Honor, the record – the record evidence does not show that he was ever presented with that issue or that question. Well, that's not my question. In other words, he's there to testify. He's there to tell his story. And he doesn't tell the story that you're now telling us or some filling in the blanks between a smuggler and the loss of his passport. But the burden is on him to do that. And so I'm asking, was there anything that restricted him at the hearing from telling that story? No, other than the fact that he was not asked the question. The IJ also mischaracterized – the other inconsistencies that the IJ found was concerns Petitioner's manner of entry into the U.S. The IJ mischaracterized Petitioner's entry – testimony regarding his crossing into a port of entry. In this case, counsel challenged that Petitioner's – at his August 5, 2005, master calendar hearing testified that he was not inspected by anyone. And he answered in the affirmative. This is consistent with his testimony. So is this the part of the testimony where he came in by automobile? Yes, Your Honor. And I think that the IJ thought it's basically impossible to come in to the United States by automobile and not be inspected. Right. So what's wrong with that judgment made by an immigration judge who's quite familiar with how one crosses into the United States via automobile? It is Petitioner's position that he was seated in the back of the vehicle when they entered the port of entry. And he testified in court that he did not recall being questioned by an immigration officer. And the evidence in the case, in the record, does support his argument because the only document that was presented at the port – that he presented at the port of entry was his Yemen identity card. I didn't get that. Maybe there's something in the record that's not in the briefs. But I thought that there was no evidence by him that he was stopped or went through any immigration check. The car just went through across the border. And the IJ says, no, that can't happen. That is true, Your Honor. However, Respondent did testify in court that he was in a vehicle. And he was not the driver of the vehicle. He was the passenger. True. True. But that isn't the issue. The issue is, was he telling the truth when he says he wasn't – that he came across in an automobile and wasn't stopped by the immigration people? And the IJ says, there's no way that's going to happen. So the difficulty is that there's three or four what the IJ called inconsistencies that we have to support unless we're compelled to feel otherwise. And I want – what is your argument that would sway us, that we're compelled to find differently than the IJ based upon this record? The Petitioner may have misunderstood the question. Even if he had understood the question that – of whether or not he was inspected, he was not personally inspected. Given his lack of proficiency in the English language, he may not understood – may not have understood what was the verbal exchange between the driver and – You're giving us a lot of maize, but we have to look at the record and be compelled to find otherwise on the credibility issue. What in the record would we rely on? No speculation, no mayhaves that the IJ was wrong on the credibility determination. Other than his testimony in court, Your Honor, there is no other documentation, independent documentation. How do you square, well, now we have him driving across the border in the backseat, and then at another time he said that he arrived in San Francisco on Lufthansa? How do you square those two stories? Well, Your Honor, Respondent did – he claims that he did sit in the backseat of the vehicle. It is reasonable to infer that he may not have noticed what was going on. Maybe probably my question wasn't clear. I understand your argument on the vehicle, but he had this other story that actually the way he got to San Francisco was that he arrived on Lufthansa. So he has one story where he gets from Yemen to Mexico on a charter flight and goes across in the car, and then he has another story where he arrived in San Francisco on a Lufthansa flight. Again, it seems inconsistencies in his arrival story. Why wasn't the IJ entitled to weigh that into the calculus? I don't believe that the IJ mentioned the fact that he had arrived in a Lufthansa. That's in the I-213. The I-213 form had that information. It had actually a couple of different stories in it. The Honor, the first page of the I-213 was prepared without an interpreter, and there – that's why a second interview was conducted between the officer with the – an Arabic speaker. And that interview, the minutes of that interview were in Arabic. This recorded on the third page of the I-213. It seems that the IJ focused a lot on this events that had happened in Yemen at the hospital, and at the end of – toward the end of the IJ's opinion or oral decision, he's saying that Mr. El-Jabry wasn't really able to clarify what had happened at the hospital, why his relative would have put his family's honor in danger and the welfare of his family. And this is actually the precipitating event that caused him to flee Yemen. So, you know, with or without the REAL ID Act, it's pretty central to his story. Do you have a response to the IJ's concern about this testimony being contradictory and inexplicable? Yes, Your Honor. I believe that the IJ erroneously held that the merits of Petitioner's asylum claim was incredible for independent reasons. The IJ questioned why Petitioner's relative had authority to speak about Petitioner's illicit relationship to Ahmad, his girlfriend, to Ahmad's cousin, when doing so would jeopardize the honor of his family. I believe the IJ was making speculation regarding the motive of Petitioner's relative, and that is improper. Petitioner explained that in court that his relative did not have the authority to speak, but what he wanted to do was to mediate and convince Ahmad's father to agree to his marriage to Ahmad. Petitioner's testimony did not waver, and he did not contradict himself during the testimony. I thought he was first saying that the relative wanted to say nice things, wanted to have the relative convey nice things about him, and then subsequently he said, no, he said that we were having an illicit sexual relation, and that was, I thought, the inconsistency or the contradiction the IJ was concerned about. Petitioner truthfully testified that the illicit romantic relationship between him and Ahmad brought shame to Ahmad's family, and that was the precipitating event that triggered Petitioner's asylum claim. And because of that, Petitioner did not make any inconsistent statements as to why it would bring shame to Ahmad's family. Kagan. Do you want to save? I think we have your point on that. Would you like to save your remaining time for rebuttal? Yes, Your Honor. Thank you. May it please the Court. I'm Manning Evans. I represent the government in this matter. Beginning with the adverse credibility determination made in these Real ID Act cases, Petitioner has tried to undermine the immigration judge's finding in the opening brief, mainly by challenging the immigration judge in saying that he had misunderstandings and incorrect beliefs about Yemeni culture. And at pages 23 to 24 of Petitioner's brief, he actually asserts that the Petitioner's father had absolutely no knowledge of any relationship at all between Petitioner and Amal. But I'd like to point out to the panel that, in fact, the immigration judge was well grounded when he was asking these questions. The Petitioner had gone twice to Amal's father to ask for Amal's hand in marriage, and so there's some reason there to think that there is a relationship. At the time that permission was sought, Petitioner told Amal's family that Amal agreed to marry. That's at page 473 of the administrative record. So, again, there's an indication to Amal's family of a relationship. And finally, at page 504, and I'm referring to the administrative record in the last case, Petitioner is asked, what is the difference in the testimony or what is the difference in what the hospitalized relative told Amal's family compared to what they already knew? At that point, Petitioner did not say, oh, Petitioner's family or Amal's family didn't know anything about any relationship at all. At that point, and again at page 504 of the record, at that point Petitioner says the hospitalized relative disclosed a sexual relationship. So that's the moment where Petitioner could have said, oh, well, all that was disclosed was a relationship of any kind, and that in itself was scandal. But that's not what the Petitioner said. So the immigration judge was right on the mark when he's thinking, what's the difference between what Amal's family already knew about a relationship and what the hospitalized relative conveyed to the family? Now, the panel is well-versed in the inconsistencies in the record concerning how the Petitioner came here. And this is a real-idea case. So those inconsistencies certainly could support an adverse credibility determination. The immigration judge's decision is just a little bit – he talks about these inconsistencies going to the time, manner and, I believe, location of entry. And then he says turning to the merits. So the immigration judge certainly thought the inconsistencies about what the hospitalized relative told or relayed to Amal's family as being the most important inconsistency. And that inconsistency is also supported by the record. As Judge Akuta pointed out, there's a shift in the testimony of Petitioner. And this occurs between pages – it's about four – page 500 to 504, I believe, of the administrative record. Petitioner agrees that the hospitalized relative was seeking to have Amal's father view Petitioner favorably. And at that point in time, all that had been suggested was that there is a relationship. Then Petitioner realizes that, oh, the hospitalized relative isn't telling the family anything that they didn't already know. So he tells them, oh, it was a sexual relationship that was disclosed by the hospitalized relative. Well, at that point, trying to say that the hospitalized relative is trying to have Amal's family view Petitioner favorably doesn't fly anymore. So we see a shift in the description of the motive of the hospitalized relative from having Petitioner viewed favorably to coercing Amal's father. And I believe the record at pages 502 to 504, the Petitioner says that the hospitalized relative was trying to convince the father to avoid any shame, to avoid any scandal. The immigration judge did not mention the change in the motive of the hospitalized relative in particular as the inconsistency, but he did mention at page 9 of his decision a concern generally about the hospitalized relative's motive. He said, why would this relative put the Petitioner's family in so much danger by disclosing a sexual relationship? And then the immigration judge does say that there's an inconsistency between Petitioner's references initially to a relationship and then later to a sexual relationship. And when viewed in the context of the testimony that takes place over four or five pages, that's a legitimate conclusion that the I.J. reached. Now, we've been clear that the I.J. only needs one inconsistency. That's correct, Your Honor. I remember the case. So I have, frank to admit, as I moved through the case, it seemed to me there were some inconsistencies, some others that were a little more catching, like the impracticality of a flight commercial or a chartered flight of five people all the way to Mexico and some of these issues. So I'm wondering why you're focusing so much on the first. Well, certainly there are other inconsistencies. I think as far as the entry goes, the inconsistency regarding the lost passport versus claiming that he returned it to the smuggler is pretty soundly established in the record. I think that by focusing on a core inconsistency, it shows the strength of the I.J.'s decision, and that's why I'm supporting that. As I mentioned, I think the other inconsistencies also support what the immigration judge did here, especially when viewed in the totality of the circumstances. Turning to the Petitioner's motions to reopen and reconsider, the Court's decision in Toffighi, which is cited in our second brief, governs here. Toffighi said that the prior adverse, that a prior adverse credibility determination can render immaterial evidence offered in a later motion to reopen where the claims are related and the adverse credibility decision is not addressed. Here, the first motion to reopen closely linked the new allegations regarding the Al-Houthi tribe to the prior claim regarding the girlfriend, Amal. That link has not been effectively broken. And so the prior adverse credibility determination under Toffighi rendered the subsequent allegations immaterial. One example of how closely the claims are linked appears in a passage in the first motion to reopen, and if I can read a short passage to the Court. The motion to reopen says, And the motion continues, Now, the evidence that was supported or offered with that motion to reopen included a letter from Petitioner's father that indicated, and this is at page 355 of the last administrative record, indicated the Petitioner himself had prior problems with the Al-Houthis. These allegations show why the Al-Houthi wanted to kill Petitioner's brother, and they showed how the Al-Houthi knew of Petitioner and the other family members of the brother who had killed the Al-Houthis. The only attempt to delink the claims appears in a short passage in the motion to reconsider. It says, And it adds that the Al-Houthi tribe are not seeking to persecute Respondent based upon his illicit affair, but based upon the fact that his brother killed an Al-Houthi member. There was some confusion as to whether Amal was an Al-Houthi member, and then he clarified she was not. He said that she was not, but yes, Your Honor, I'm sorry. But then I guess he's saying this on his motion to reopen, these circumstances really relate to the brother having killed someone. He is trying to say that. But in his motion to reconsider and the second motion to reopen, he provides no evidence to explain the supposed typing mistake, which really hardly explains how the first motion to reopen wove such an intertwined story of the claim involving the girlfriend and the claim involving the Al-Houthis. Furthermore, the father's letter still indicates that Petitioner had past problems with the Al-Houthi. So simply saying, oh, the Al-Houthi claim had nothing to do with what happened in the past, doesn't explain the Petitioner's father's letter. That's at page 355. Is there some explanation of why the name of the tribe was changed to? Just the typing mistake, Your Honor. That's it? As far as I know. Do we have any evidence of the typist? No, Your Honor. No evidence was ever offered. No affidavit. No explanation. This is the Al-Hubari v. the Al-Houthi tribe? Or are there two or are those confirmed to be two separate tribes? Yes. The Amal's girlfriend was considered to be a member of the Al-Hubari tribe, I believe, originally. And then the motion to reopen said that she was a member of the Al-Houthi tribe. And then the reconsideration said, no, that's not true. It said that's not true. She's an Al-Hubari, and that's all it says. It doesn't go any further to extricate the Al-Houthi claim from the links to the original claim. And I point out, and the Board was concerned on this as well, when Petitioner tries to extricate the new claim from the old one and says the two are unrelated, as a result of that, we have no explanation of why the brother killed an Al-Houthi. It just happened. Whereas previously we had an explanation saying that the brother had killed him because of the continued violence inflicted on them by the Al-Houthi tribe. And we also have no explanation of how the Al-Houthis even knew about Petitioner. How did the Al-Houthis know about Petitioner and the father whose house they supposedly raided? In the motion to reconsider, did the immigration judge decide that this change of tribes is new evidence? Because there had been a prior appeal to the Board, it would be the Board that ruled on the motion to reconsider. And the Board said, you've not identified any errors that we made. They're not allowed to bring new evidence. He is not allowed to bring new evidence in the motion to reconsider. In a motion to reconsider. And I was wondering whether they identified that as new evidence or not. I don't believe so, Your Honor, because they addressed it as a motion to reconsider. That's how it was presented to the Board. That's how the Board interpreted it. Petitioner has had counsel throughout these proceedings.  I think the original claim involving the girlfriend and the subsequent claim involving the Al-Houthis were never de-linked effectively. The Toffighi decision really does support denying the petition for review with respect to the motions to reopen and the motion to reconsider. I'd also point out to the Court that while asylum was mentioned, this case is mostly about withholding claims. I think there was some concern about whether or not the Board addressed a cat claim in the last decision. All the Board had to do there was decide whether or not there were changed circumstances justifying reopening. So that decision covered all of the claims that the Petitioner was trying to raise. Also, there's some concern about an opportunity to explain. I don't think I covered this, but I don't believe that that argument was ever asserted in the briefs here. So Petitioner's counsel – Petitioner had his attorney at the immigration hearing. If the immigration – or if the Petitioner's attorney had had any questions, he could have asked them. The immigration judge actually – at page 505 of the record, the immigration judge actually offered the counsel an opportunity to ask further questions after the immigration judge had asked the very questions on which he relied to find an adverse credibility determination. If the panel has no other questions, we'd ask that the petitions for review be denied. Thank you. Thank you very much. You have about a minute for a rebuttal, if you have any key point. I would like to go back to the argument regarding the illicit relationship between Petitioner and Maul. There is a clear and synoptic argument that Petitioner and Maul were not in a relationship  and Maul. There is a significant difference between the information that Maul's father knew prior to being spoken to by Maul's cousin, and that being that – that they – that Maul and Petitioner actually had sexual relations, and this and the Middle East culture is prohibited and do not precede a marriage proposal, Your Honor. And it is when there is a romantic relationship in this instance that shames or dishonors the family. With regards to Petitioner's motions to reopen and motion for review, I would like to make a point of clarification. It is our position that the Board abuses its discretion by denying the motion. The Board's reliance on Petitioner's failure to include a new asylum application is erroneous. The regulation at 8 CFR 1003.2c1 states that a motion to reopen for the purpose of submitting an application for relief must be accompanied by a new application. This is a case where Petitioner is presenting changed circumstances, presenting evidence of changed circumstances, which is related to an existing asylum application, and he is not applying for a new relief. Therefore, the language of the statute does not instruct that submission of a new asylum application is necessary. Thank you. The case just argued, Aljabari v. Holder, is submitted.
judges: Wallace, McKeown, Ikuta